## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MONROE BERNARD WASHINGTON,

    Plaintiff,

    v.

N.B.C.I. ADMINISTRATIVE REVIEW
TEAM, et al.,

    Defendants.

Civil Action No.:  SAG-24-1097

## MEMORANDUM OPINION

Pending in this civil rights case are motions filed by *pro se* Plaintiff Monroe Bernard Washington, including Motions for Injunction and Temporary Restraining Order, ECF 15, to Appoint Counsel, ECF 23, 36, and for Discovery. ECF 46-1.  Correctional Defendants opposed the Motion for Injunction and Temporary Restraining Order, ECF 17, and have filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, ECF 30, as well as Motions to Seal, ECF 18 and 32. Washington opposes the dispositive motion. ECF 35,[1] 42, 46. Correctional Defendants filed a Reply, ECF 45, and Washington filed a surreply, ECF 46,[2] which Correctional Defendants moved to strike. ECF 47.  No hearing is required to resolve the pending matters.  *See* Local Rule 105.6 (D. Md. 2025).  For the reasons that follow, Correctional Defendants' dispositive motion,

---

[1]    ECF 35 was docketed as a Response to Correctional Defendants' dispositive motion, but is a Motion to Appoint Counsel.

[2]    Although surreplies are generally not permitted without leave of court, this Court has considered the filing in light of Washington's self-represented status. Correctional Defendants' objection to the surreply on the basis of its timing, content, and Washington's failure to seek leave of Court, is not persuasive given Washington's self-represented status and his inclusion of a request for discovery pursuant to Fed. R. Civ. P. 56(d) which Correctional Defendants do not address.  As such, Correctional Defendants' Motion to Strike (ECF 47) is denied.

shall be DENIED without prejudice. The remaining non-dispositive motions are addressed individually below.

## NON-DISPOSITIVE MATTERS

### A. Correction of Docket

In his original complaint, Washington named as Defendants "supervisory officials" and described them as the Defendants named in *Washington v. MD DPSCS agent, et al.*, Civil Action No. SAG-22-2424 (D. Md.). ECF 1 at 4. Those Defendants are Sgt. Brian Lewis, Sgt. Allen Graham, Lt. Vaughn Whiteman, Sec. Chief Ronald Stotler, and Assistant Warden Keith Arnold. *See* Civil Action No. SAG 22-2424 at ECF 7. They were added to the docket. However, Washington did not name any of these Defendants in his Amended Complaint. In an apparent docketing error, these Defendants were not removed from the docket. Washington has clarified that he did not intend to name Lewis, Graham, Whiteman or Stotler as Defendants in this case. *See e.g.* ECF 36-4. Defendants Lewis, Graham, Whiteman and Stotler are dismissed from this case. *See Young v. City of Mount Ranier*, 238 F. 3d 567, 572 (4th Cir. 2001) (holding "[A]n amended pleading ordinarily supersedes the original and renders it of no legal effect." (citation omitted)). Because Washington named as a Defendant "Assistant Warden", who he asserts was responsible for his removal from Administrative Segregation, the case shall proceed as to Keith Arnold, who previously served as Assistant Warden.

Additionally, the Amended Complaint lists as Defendants "NBCI Administrative Review Team", "Assistant Warden", and "ARP Coordinator at NBCI". ECF 16. Correctional Defendants have identified Cory Walker, Keith Arnold, and Bethany Cornachia as "Assistant Warden[s]" at the relevant time. *See e.g.* ECF 31-13, 31-14, 31-15. Correctional Defendants have identified Mary Johnson, Joshua VanSkiver, Jason McMahan, Benjamin Crowe, Lawri Winters, and Shannon

McKenzie as members of the NBCI Administrative Review Team. *See* ECF No. 19. Correctional Defendants have not specifically identified "ARP Coordinator at NBCI" or provided the full name of Defendant Fritz, who is listed in the caption of Washington's Amended Complaint.

In light of the foregoing, the Clerk shall amend the docket to list Defendants as follows: Correctional Officer II (CO II) Randy Adkins, CO II Gerald Wolfe, CO II Christel Kelley, CO II Steven Miller, CO II Shawn Murray, Sgt. Michael Judy, CO II Dean Rounds, CO II Logan Dye, CO II Christopher Vinci, CO II Robert Pattison, Lt. Earl Ritchie, Lt. Marvin Metz, CO II Roman Raley, Case Manager Richard Roderick, Case Manager Fritz, Cory Walker, Warden Keith Arnold, Assistant Warden Bethany Cornachia, Mary Johnson, Joshua VanSkiver, Jason McMahan, Benjamin Crowe, Lawri Winters, Shannon Mckenzie, "ARP Coordinator at NBCI", (hereinafter "Correctional Defendants"); YesCare Corp., and John/Jane Doe Nurses (hereinafter "Medical Defendants").

### B.  Motions to Seal

The Motions to Seal Correctional Defendants' opposition to Washington's Motion for Temporary Restraining Order (ECF 18), and the Memorandum and Exhibits in support of Correctional Defendants' dispositive motion, (ECF 32), both unopposed by Washington, are granted.

### C.  Motions to Appoint Counsel

Washington's Motions to Appoint Counsel (ECF 23, 36) are granted because, as discussed herein, the case will proceed to discovery.  In his first two requests, Washington states that he is not able to afford counsel and his imprisonment will limit his ability to litigate his claims.  ECF 23, 35. He states that a trial will involve conflicting testimony and counsel would be better able to present evidence and examine eyewitnesses. *Id*. Additionally, he has endeavored to retain counsel

but has been unsuccessful. *Id.* In his third filing requesting counsel, Washington states that the issues involved "are not complex, but vast". ECF 36 at 1. He indicates he was not provided with the memorandum of law or exhibits in support of Correctional Defendants' dispositive motion. *Id.* at 2. Correctional Defendants remailed their dispositive motion and all exhibits to Washington (ECF 38) and Washington has substantively responded to those filings. ECF 42.

A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1), is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779 (4th Cir. 1975); *see also, Branch v. Cole*, 686 F.2d 264 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances." *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by *Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel); *see also Jenkins v. Woodard,* 109 F.4th 242, 247 (4th Cir. 2024) ("…a district court must conduct a fact specific, two-part inquiry to assess whether a case presents exceptional circumstances before it decides whether to appoint counsel" including "whether the plaintiff has a colorable claim" and "considering the claim's objective complexity and the plaintiff's subjective abilities, whether the plaintiff lacks the capacity to present it." (internal quotations omitted)).

Washington presents a colorable claim, thus, this Court must consider whether, given "the claim's objective complexity and the plaintiff's subjective abilities," Washington "lacks the capacity to present it." *Jenkins*, 109 F.4th at 247. As discussed below, the Court finds that

Washington is entitled to discovery and given that he is no longer incarcerated in Maryland and that discovery will likely include depositions, counsel is necessary to assist him in that process.

**D.    Injunctive Relief**

In his Motion for Injunctive Relief, Washington complains about his August 17, 2024, removal from administrative segregation and return to Max II housing, where he was stabbed by another inmate.  ECF 15 at 2.  As relief, he seeks an order that he be placed on administrative segregation. *Id*. at 8.  Washington is no longer incarcerated in the State of Maryland (ECF 39, 41).

Article III of the Constitution limits the judicial power to "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted).  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III – when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted).  For a declaratory judgment to issue, there must be a dispute which "calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts." *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 242, 242 (1937); *see also Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  Where injunctive or declaratory relief is requested in an inmate's complaint, it is possible for events occurring subsequent to the filing of the complaint to render the matter moot.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (transfer of prisoner moots his Eighth Amendment claims for injunctive and declaratory relief); *see also Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 248–49 (4th Cir. 2005) (pre-trial detainee's release moots his claim for injunctive relief); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987) (holding that the transfer of a prisoner rendered moot

his claim for injunctive relief). Because Washington is no longer incarcerated in Maryland, his Motion for Injunctive Relief (ECF 15) is denied.

## BACKGROUND

### A. Washington's Allegations

The following facts are viewed in the light most favorable to Washington, the non-moving party. Washington, then a Division of Correction inmate housed at North Branch Correctional Institution ("NCBI") in Cumberland, Maryland, filed the above-captioned civil rights complaint, as amended, pursuant to 42 U.S.C. § 1983, against Correctional Defendants, alleging he has been retaliated against for filing a previous lawsuit and administrative grievances. ECF 16 at 1. He claims that Correctional Defendants failed to protect him from a known risk of harm, they have improperly placed inmates in double cells on "Max II," his grievances have not been properly investigated, staff have told other inmates that Washington is a snitch, he was improperly removed from "Ad.Seg" to Max II, false reports were written against him, procedures were violated, he was forced to stay in a cell that had been flooded with feces, and he was denied a mattress and a blanket for months. As to YesCare and medical providers, Washington asserts generally that he has been denied adequate medical care.[3] ECF 16.

---

[3]    Neither YesCare nor any individual medical providers have been served with the Amended Complaint. Washington's medical claims shall not proceed in the context of this case. First, his claim cannot proceed as to YesCare. The doctrine of respondeat superior does not apply to claims asserting constitutional deprivations brought pursuant to 42 U.S.C. § 1983. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). As in this case, a private corporation that steps into the shoes of a state actor cannot be held liable for a § 1983 claim solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009). Instead, liability to a private entity attaches only when a constitutional deprivation results from the entity having implemented an unconstitutional policy, custom, or practice. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Therefore, to proceed against YesCare, Washington must identify some evidence that he was denied medical treatment pursuant

In his Amended Complaint, Washington asks that the Court place a lien on Defendants' assets. ECF 16 at 2. As further relief, Washington seeks punitive damages and any other damages that the Court may deem appropriate as well as a declaration that Washington cannot be housed safely at NBCI. *Id*. at 14.

In support of his Amended Complaint and in his Opposition Response, Washington provides a list of issues he encountered during his incarceration in Maryland. ECF 16 and 42. Additionally, Washington states, without specificity, that there are many questions of fact that preclude summary judgment and that the current record contains genuine issues of material fact. ECF 42 at 11.

1. *Administrative Remedy Procedures (ARPs)*

Washington states that ARPs he files "have met with silence due in part to the NBCI ARP coordinator being close friends with most of these defendants." ECF 16 at 3. He also states that Defendants Miller and Vinci took his ARPs but did not sign them or provide him with a copy as required. *Id*. at 4-6. In his opposition, Washington notes that exhibits filed by Correctional Defendants include an Inmate Grievance Complaint he filed, asserting that on Friday January 12, 2024, Defendants Vinci and Miller worked on his tier and made last rounds together. ECF 42 at 6.

---

to a policy, custom, or practice and it proximately caused a violation of his constitutional rights. *Monell*, 436 U.S. at 690; *see also Jordan ex rel Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). Additionally, he has not identified any individuals who he claims are responsible for the alleged denial of care or linked specific conduct to any individual defendants. Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). As such, Washington's complaint cannot proceed as to the unnamed medical providers. Washington's medical claims are dismissed without prejudice. If he believes his constitutional rights have been denied in the context of his medical care, he may file a separate civil rights case asserting those claims and providing specific factual allegations against individual defendants.

Washington complained that he placed an ARP in the cell door to be picked up and he claims the camera would show they failed to follow policy concerning signing and giving Washington a copy of his ARP. *Id.* at 6-7. Next, Washington explains that within his grievances there is evidence of his appeal regarding officers not signing and providing copies of ARPs. *Id.* at 7. Further, Washington asserts Vinci was hired to get vengeance for the murder of his brother who was killed working in corrections, his motive was to "hurt someone anyone, and those that hired this Defendant knew this fact." *Id.* at 10.

 2. *Exposure/Creation of Risk of Harm*

 a. *Removal from Administrative Segregation*

Washington alleges that the NBCI Administrative Review Team and Assistant Warden removed him from Administrative Segregation on four occasions, after which he was assaulted or stabbed. ECF 16 at 5. The only opportunity Washington had to express the threat to his safety was during his Administrative Segregation Review Team meeting but his participation was interrupted by Defendant Judy, who escorted him out of the meeting because he was Adkins's and Kelley's supervisor and they intended to have Washington removed from the building due to his filing ARPs. *Id.* Washington notes that he filed an ARP concerning his claim that Judy cut him off while he attempted to explain his need for administrative segregation. ECF 42 at 7. Washington believes all Correctional Defendants demonstrated a lack of care when removing him from Administrative Segregation and returning him to Max II with his documented enemies. ECF 6 at 8-9. Additionally, he explains that none of the Correctional Defendants asked him "the who-what-when-where and or why to aid in the safety of plaintiff at any level." *Id.* at 6-7.

 b. *Conditions*

Next, Washington complains that the Assistant Warden placed Max II inmates in double cells that were designed for one inmate. ECF 16 at 6. The cells only have one cable and one electrical outlet and no emergency button. *Id.* In his view, this places the most dangerous inmates together and is reckless and unconstitutional. *Id.*

Washington states that Defendant Pattison collected inmate request slips and gave those to gang members. ECF 16 at 7. He further claims that Pattison "made a habit of telling other inmates that plaintiff was a snitch." *Id.* After Washington "wrote up" Officer Kelley, she also spread rumors that Washington was a snitch. *Id.* at 7-8. After Washington "wrote up" Defendant Dye, Dye removed Washington's commissary and gave it to another inmate. *Id.* at 7. Dye let other inmates know that Washington was "running from Minnesota." *Id.*

Washington asserts that the actions of Pattison, Dye, and Kelley placed him in harm's way and demonstrated a disregard for his safety. ECF 16 at 8. He claims that the incidents have been documented with ARPs and requests to Defendants' supervisors. *Id.* at 8. Additionally, Washington claims that Kelley directed Adkins to confiscate Washington's property and, after the property was confiscated, taunted Washington by saying "checkmate Bxxch". *Id.* at 8.

   *c. Assaults*

In his Opposition Response, Washington reiterates that Correctional Defendants failed to protect him from assault on four occasions. ECF 42 at 9. He asserts that all Correctional Defendants were on notice but callously disregarded the risk with the intent to harm him after his many complaints of a hit having been placed on his life by gang members. *Id.*

In his Amended Complaint, Washington states that on November 12, 2022, the officer in charge of Unit 2/D Tier instructed all workers to return to their cells for the sole purpose of opening his cell door "to go into a mop closet to fight the inmate that original[ly] placed a contract on

[Washington's] life." ECF 16 at 3. Washington states that he was threatened by the same gang member that if he did not fight, he would be stabbed again. *Id*. at 4. Washington notes that Correctional Defendants have control of the video but only provided certain video in support of their dispositive motion. ECF 42 at 8, 10.[4]

On an unspecified day, Washington states he advised Sgt. Ritchie his cell was being flooded through the vent with feces/bio waste, but Ritchie refused to file a report or call for cleanup. ECF 16 at 10.

Next, Washington claims that Defendants Miller and Kelley, along with other unidentified staff, were not in their assigned area before, during, or after Washington's stabbing on August 17, 2024. *Id*. Washington claims that Defendants should have been on the inside of the tier whenever inmates' doors were open. *Id*. Washington asserts this "was orchestrated hit, that all defendants were present took an active part in." *Id*. at 10. In his opposition response, Washington explains that he viewed the video of the incident and disputes that Correctional Defendants ran in to place themselves in harm's way: he was at the tier door before any Defendant walked into the area. ECF 42 at 5. Additionally, Washington argues that Defendant Miller's declaration does not mesh with

---

[4]    In Correctional Defendants' reply, they advise there is no video of the incident because DPSCS was not on notice of the alleged incident until more than one year after Washington claims the event occurred. ECF 45 at 3-4. Washington did not notify anyone at DPSCS, DOC, or his medical provider about the alleged incident until January 23, 2024, when he filed a grievance with the Incarcerated Individual Grievance Office ("IIGO") in preparation for filing this case. ECF 31-1 at 7-8, 19; ECF 31-13 at 10-12; ECF 31-19, ¶ 3; ECF 31-19 at 19-19; ECF 31-9 at 3-12. In his IIGO grievance, filed three months before filing this case, Washington asserted that the incident happened on November 24, 2022, whereas in his Amended Complaint and other filings, Washington states the incident happened on November 12, 2022. ECF 16 at 3. In any event, daily video footage from the surveillance cameras at NBCI are not retained indefinitely. ECF 45-2, ¶ 2. NBCI uses a DVR network video recording system that allows video footage to record over older footage after an unspecified amount of time, generally thirty days. *Id*. As such, to retain video from a specific camera, the video must be intentionally archived and preserved. ECF 45-2, ¶ 3. No video footage was archived for activity on NBCI's Housing Unit 2/Tier D related to Washington's claim of a November 2022 closet fight. *Id*. ¶ 5.

Defendant Kelley's: what is missing from both, in Washington's view, but what Washington contends the camera catches, is a second inmate who attempts to block Washington's escape. *Id*. at 5. This inmate attempted to swing at Washington but was not charged with a rule violation. *Id*.

Next, Washington asserts that Defendants Wolfe and Murray were present "at every incident, aided and looked on, encouraging gang members with thumbs up, and okay signs after plaintiff was stabbed and assaulted the first time." ECF 16 at 9.

Washington notes that in an ARP dated September 24, 2023, he stated he was surrounded by daily stabbings and death from drugs and officers placing bets on inmates' lives. ECF 42 at 3. He wrote in that ARP that officers and the administration all had knowledge of "what going on." *Id*. Additionally, Washington states that Defendant Roderick dealt with the first time Washington was stabbed, on September 27, 2023, and as of December 6, 2023, all case managers had knowledge of the risk to his safety which he claims is demonstrated by his case management sheets and his reports that others had threatened him and placed a hit on him. ECF 42 at 3. He claims that case managers and others knew or should have known he was in harm's way. *Id*. at 4.

Additionally, Washington states that Defendant Rounds attempted to incite Washington by saying, "What you scared to go back on Max II huh? Yeah, they gonna fxxck you up and wont miss next time." (sic) *Id*. at 10-11. Washington claims this statement was made after the March 24, 2024, incident "when the same gang members that run NBCI with the help of officers, Sgt. and Lt. jumped plaintiff sending plaintiff to the hospital." *Id*. at 11.

*3. Retaliation*

Washington claims that Correctional Defendants have actively retaliated against him, allowing near death stabbings and attacks because Washington filed grievances. *Id*. at 11.

Additionally, he states that Rounds, who is in charge of property and trained Adkins, refused to provide Washington a mattress or a blanket for months in retaliation for his filing ARPs. ECF 16 at 10. Also, Defendant Raley wrote a false report on Washington on August 17, 2024. ECF 16 at 9.

Washington asserts that none of the supervisory Correctional Defendants can claim a lack of knowledge. *Id*. at 11. Specifically, Lt. Metz is the building one supervisor where all segregation inmates are housed. He is the immediate supervisor of Ritchie, Rounds, Wagner, Pattison, and until recently Kelley, Adkins, Dye, and Judy. *Id*. at 12. Washington states that Metz disregarded grievances that detailed the conduct of his subordinates. *Id.* Metz refused "to do the right thing" and supported the retaliation of all Correctional Defendants who were his subordinates. *Id*. at 12.

Because Washington wrote ARPs on Correctional Defendants Adkins and Kelley, Adkins confiscated Washington's TV, X-box, and tablet. ECF 16 at 4. Adkins told him to take back his ARPs and he would return his property. *Id*. at 12. Washington points to his ARP detailing the retaliation by Kelley and claims, in his opposition response, that after reading this ARP, Kelley went to Adkins to take his tablet. ECF 42 at 4. In his opposition, Washington notes, Kelley denied his ARP filed on June 7, 2023. ECF 42 at 4. Additionally, Washington points out one of his grievances addressed Dye taking his personal property and giving it away. ECF 42 at 7.

### B. Correctional Defendants' Response

Correctional Defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. ECF 30. In support, Correctional Defendants filed a Memorandum of Law (ECF 31-1) with exhibits including authenticated records (ECF 31-6, 31-9, 31-13, 31-18, 31-19) and the Declarations of ICC Coordinator Truitt (ECF 31-3); Inmate Hearing Office Chief Hearing Officer Rowe (ECF 31-6); CO II Wariner (ECF 31-7); Correctional Case Management Specialist II

Bradley (ECF 31-13); Special Assistant to the Director of Patuxent Institution Donnelly (ECF 31-18); Inmate Grievance Office employee Sandra Holmes (ECF 31-19); and Defendants Johnson (ECF 31-4); Roderick (ECF 31-5), Adkins (ECF 31-8); Wolfe (ECF 31-10); Kelley (ECF 31-11); Miller (ECF 31-12); Murray (ECF 31-14); Walker (ECF 31-15); Arnold (ECF 31-16); Cornachia (ECF 31-17); Judy (ECF 31-20); Rounds (ECF 31-21); Dye (ECF 31-22); Vinci (ECF 31-23); Pattison (ECF 31-24); Ritchie (ECF 31-25); Metz (ECF 31-26); and Raley (ECF 31-27).

Correctional Defendants argue that: 1) they are immune from suit in their official capacities under the Eleventh Amendment; 2) Washington's claims not asserted in the Amended Complaint but included in the initial Complaint must be dismissed; 3) Washington has failed to state a claim as to Defendants Roderick and Fritz; 4) the Amended Complaint fails to state a claim for retaliation as to Washington's assignment to Max II general population, altercations, interference with ARPs, or in regard to particular Correctional Officers; 5) the Amended Complaint fails to state a claim for failure to protect from harm; 6) the Amended Complaint fails to state a claim under the Eighth Amendment; 7) the Amended Complaint fails to state a claim regarding the processing of Washington's administrative complaints; 8) Washington's claims regarding verbal harassment fail to state a claim; 9) Washington failed to exhaust administrative remedies; 10) claims regarding lost personal property do not state a constitutional claim; 11) Washington fails to state a claim as to false charges/reports; 12) there is no respondeat superior liability; 13) Defendants are entitled to qualified immunity; and 14) Washington's request to attach Defendants' assets must be denied. ECF 31-1.  In support of their motion, Correctional Defendants provide the following information.

    *a.  Washington's transfer to Maryland and Housing Assignment*

Correctional Defendants explain that in December of 2021, Washington was transferred from the Minnesota Division of Correction to the custody of the Maryland Department of Public

Safety and Correctional Services ("DPSCS"), pursuant to the Interstate Correctional Compact ("ICC").  ECF 31-3, ¶ 2; ECF 31-4; ECF 31-16. Washington was sent to DPSCS because of his extensive history of assaulting staff and other prisoners in Minnesota. ECF 31-16, ¶ 3. Nevertheless, when he arrived at DPSCS, Washington was classified as medium security. ECF 31-4, ¶ 3; ECF 31-5, ¶ 3; ECF 31-16, ¶ 3. After he attacked and injured another inmate, his security status was reevaluated and raised from medium to Max II, DPSCS's highest security level. ECF 31-6 at 3; ECF 31-5, ¶ 4; ECF 31-16, ¶ 3.

DPSCS has only one facility which houses Max II inmates, NBCI. ECF 31-5, ¶ 4; ECF 31-4, ¶ 3; ECF 31-16, ¶ 3. After Washington's security level was raised to Max II, he was transferred to NBCI and assigned to Max II housing.  ECF 31-5, ¶ 4; ECF 31-4, ¶ 23; ECF 31-16, ¶ 3.

Inmates housed on Max II receive the highest security. ECF 31-5, ¶ 5. Max II inmates are assigned to a small specially selected group comprised of no more than eight prisoners and each small group is assigned its own recreation time separate from other prisoners on the tier. ECF 31-5, ¶ 5; ECF 31-7, ¶ 2; ECF 31-8, ¶ 3. The groups are selected to reduce the likelihood of unlawful conduct, including assaults. *Id.*  The small groups also allow for greater prisoner movement due to the increased supervision and minimized exposure to other inmates, without the need for the restrictions of Administrative Segregation housing. *Id.*

NBCI has two Max II general population housing units: HU2A and HU2D. ECF No. 31-5, ¶ 6.  The use of two housing units allows NBCI to separate enemies among the Max II general population and provides an alternative to assigning Max II inmates who have enemies designated as Max II to segregation housing. *Id.*

Where "an inmate requires close supervision, segregation from the general population or both [special housing confinement] may be used to ensure the safety and security of the institution,

staff, individual inmate population or some combination of these factors." DCD 100.0002, § 17.A. Nevertheless, DPSCS's goal is to minimize the time an inmate spends on Administrative Segregation. ECF 31-5, ¶¶ 7-8. Moreover, segregation housing is limited and reserved for those situations that require it. *Id.*

    *b.  Washington's Assignment to and Removal From Administrative Segregation*

Before August of 2024, Washington was assigned to Administrative Segregation pending investigation on four occasions: three times to investigate threats to his safety and once due to his threats to staff. ECF 31-5, ¶ 10.

Mary Johnson, former Correctional Case Manager at NBCI, explains that she was a member of the Administrative Segregation Review Team the three times between September 2022 and August 2024 when Washington was considered for release from assignment to Administrative Segregation. ECF No. 31-4, ¶ 4. Johnson explains that Washington had been assigned to Administrative Segregation pending investigation of his concerns regarding his personal safety. *Id.* She avers that decisions made regarding Washington had his safety as the team's first concern. *Id.*

Washington's June 8, 2022 Case Management Assignment Sheet demonstrates he was transferred as an ICC inmate to Maryland due to his extensive assault history and he was then to be reclassified to Max II and released from Administrative Segregation. ECF 31-16 at 5. An investigation had been completed, which determined he could be housed in general population. *Id.* Lawri Winters approved the change on June 15, 2022. *Id.*

On an unspecified date, Washington was again assigned to Administrative Segregation after he was assaulted. ECF 31-16 at 4-5. The Intelligence Department completed an investigation into Washington's safety and on September 27, 2022, recommended Washington be reassigned

from Administrative Segregation to Max II general population because Administrative Segregation was no longer warranted. *Id.* Johnson explains that the decision to remove Washington from Administrative Segregation was made after receiving information from the intelligence office that Washington's enemies had been moved to a different housing unit and would not be housed on Max II: the intelligence officer recommended Washington's return to Max II. ECF 31-4, ¶ 5. Johnson and the other team members agreed with the recommendation. *Id.*

On another unspecified date, Washington was again assigned to Administrative Segregation pending investigation of risks to his safety: on June 7, 2023, the Administrative Segregation Review Team reviewed information from the intelligence officer who investigated the matter.  ECF 31-4, ¶ 6; ECF 31-5 at 6.  It was noted that Washington was an ICC inmate and the sending state had received a letter claiming a threat on his life. ECF 31-15 at 6. Intelligence investigated the matter and cleared Washington's release to Max II to the housing unit separate from the unit where his only Max II enemy was then housed. ECF 31-4, ¶ 6; ECF 31-5 at 6; ECF 31-15 at 5. Washington participated in this Administrative Segregation Review and was advised of the team's recommendation regarding his return to general population Max II.  *Id.*

On December 6, 2023, a note was entered on Washington's Case Management Assignment Sheet stating that Washington had been placed on Administrative Segregation pending an investigation due to Washington's claims that several inmates had threatened him and a "hit" had been placed on him.  ECF 31-15 at 4; ECF 31-5 at 8.  Lt. McKenzie completed the investigation of this claim and recommended removing Washington from Administrative Segregation and returning him to general population. ECF 31-15 at 4; ECF 31-4, ¶ 7.  The team again agreed with the intelligence officer's recommendation. *Id.*

Sgt. Judy denies ever forcing Washington to leave a segregation review meeting. ECF 31-20, ¶ 4. Judy states that had there been good reasons for Washington to remain on segregation, those reasons would have been considered. *Id*., ¶ 5. Judy recalls that the decision to remove Washington from segregation and return him to Max II general population made in December of 2023 was based on an investigation and report by intelligence personnel that there was no need to keep Washington on segregation because there were no hits against him and the threats he issued against staff had been resolved. *Id*., ¶ 5. Judy recalls attending the December 2023 segregation review meeting with Washington. *Id*., ¶ 6. When Washington was told of the recommendation to remove him from segregation and return him to Max II general population, he was given an opportunity to speak. *Id*. Washington was only escorted out of the meeting when it was over and Judy recalls that Washington did not object to the housing change. *Id*.

On May 9, 2024, Washington was placed on Administrative Segregation pending an investigation due to threats he made toward NBCI staff which included correspondence to NBCI's Assistant Warden, stating "the blood shed of officials is a must." ECF 31-5, ¶ 13; ECF 31-5 at 9-11. On August 7, 2024, after completion of the investigation into Washington's threats against staff, the Intelligence Office recommended Washington's return to Max II general population, which was approved by the Assistant Warden. ECF 31-5, ¶ 14; ECF 31-5 at 10-11; ECF 31-5 at 12; ECF 31-17 at 4. It was also noted that Washington's documented enemies were housed on Max II D wing. *Id*. Washington returned to Max II general population on August 17, 2024. *Id*.

Correctional Case Management Supervisor Cory Walker explains that while he was Acting Assistant Warden, he twice considered recommendations to remove Washington from segregation and return him to Max II general population: one in June 2023 and the other in December 2023. ECF 31-15, ¶ 3. Warden Keith Arnold, as Assistant Warden, also considered two recommendations

to remove Washington from segregation and reassign him to Max II general population: one in June of 2022 and the other in October of 2022.  ECF 31-16, ¶ 4. Assistant Warden Bethany Conrachia considered one recommendation for Washington to be removed from segregation to Max II general population: August 2024.  ECF 31-17, ¶ 2.

Arnold, Walker, and Cornachia explain that on each occasion, the Administrative Segregation Review Team provided them with their recommendation. ECF 31-16, ¶ 5; ECF 31-15, ¶ 4; ECF 31-17, ¶ 4.  On each occasion, the Assistant Warden considered the recommendation and reached a decision based on the review team's due diligence, the intelligence unit's investigation, and information they each gathered from their own attendance at the weekly segregation meetings.  *Id*. The weekly segregation meetings were attended by upper-level custody administrative staff including the designated or acting Assistant Warden, correctional officers including Majors and Captains, housing unit managers, and staff from psychiatry, social work, and the medical contractor, all of whom discussed Washington's situation as well as the situation of others assigned to segregation. *Id*. Arnold, Walker, and Cornachia each explain that based on the information discussed at the weekly segregation meetings, the intelligence notes, and formal recommendations from the Administrative Segregation Review Team, on each occasion they approved Washington's return to Max II general population.  ECF 31-16, ¶ 6; ECF 31-15, ¶ 5; ECF 31-17, ¶ 5.

Additionally, Arnold, Walker, and Cornachia explain that decisions about cell and cell sharing assignments are made by case management in conjunction with the traffic department. ECF 31-16, ¶ 7; ECF 31-15, ¶ 6; ECF 31-17, ¶ 6.  Those decision are made after investigating inmates' enemies and other unspecified factors to promote safety. *Id*.  Lastly, Walker and Cornachia

explain that NBCI does not have enough cells for each inmate to have a single cell (ECF 31-15, ¶ 7; ECF 31-17, ¶ 6) and the vetting process for Max II cellmates is generally successful. *Id.*

    *c.  Assaults*

Correctional Defendants explain that there are three documented altercations involving Washington while he was housed on Max II.  The first incident occurred in August of 2022 and was the subject of *Washington v. MD DPSCS agent, et al*., Civil Action No. SAG-22-2424. ECF 16 at 5. The second incident occurred on March 24, 2024, and Washington was the aggressor.  ECF 31-6 at 5-6. The third occurred on August 17, 2024, when Washington was stabbed by another inmate. ECF 31-11, ¶ 2.

In general, Correctional Defendants explain that as to each of the documented altercations, staff were properly positioned outside of the open tier door, looking onto the tier, ready to intervene if necessary but safely distanced so, if a prisoner attacked them, they could contain the attack by closing the tier and preventing an ambush.  *See e.g.* ECF 31-10, ¶ 4; ECF 31-11, ¶¶ 2, 4, 7-8; ECF 31-12, ¶¶ 2, 6, 8; ECF 31-13 (Videos A-D, filed separately).  Defendants Kelley and Miller explain that when inmates on Max II are moving in small groups on the tier, for safety reasons, correctional staff remain on the other side of the glass doors at the end of the tier. ECF 31-11, ¶ 2; ECF 31-12, ¶ 2.  Staff can see activity in the tier hallway from that position. ECF 31-11, ¶ 2.

Correctional Defendants further explain that when an altercation among inmates begins, correctional staff are to report the situation by calling a 10-10 code over the radio, which alerts other officers to come assist. ECF 31-7, ¶ 4; ECF No. 31-11, ¶ 3; ECF No. 31-10, ¶ 3; ECF 31-12, ¶ 4.  It is not safe for officers to enter the area of a fight unless there are sufficient officers present to contain the situation, and staff are not to enter the area if they are outnumbered by inmates. *Id.*

This policy is designed to protect the safety and security of the institution by limiting the ability of prisoners to easily attack, hold hostages, or kill correctional staff. *Id.*

Adkins, Wolfe, Murray, Judy, Rounds, Dye, Vinci, Pattison, Ritchie, Metz, Raley, and Johnson each deny that before the incidents on August 26, 2022, March 24, 2024, and August 17, 2024, Washington reported to them that he feared a specific person or had received a specific or direct threat against him. ECF 31-8, ¶ 8; ECF 31-10, ¶ 10; ECF 31-14, ¶ 4; ECF 31-20, ¶ 7; ECF 31-21, ¶ 6; ECF 31-22, ¶ 5; ECF 31-23, ¶ 5; ECF 31-24, ¶ 6; ECF 31-25, ¶ 4; ECF 31-26, ¶ 7; ECF 31-27, ¶ 6; ECF 31-4, ¶ 11. Adkins, Wolfe, Murray, Judy, Rounds, Dye, Vinci, Pattison, Ritchie, Metz, Raley, and Johnson each aver that they did not have any information that Washington was in any particular or imminent risk of harm. *Id.* For his part, Murray was not working on site at NBCI on August 26, 2022, March 24, 2024, or August 17, 2024. ECF 31-14, ¶ 5.

    i.    August 26, 2022, assault

The August 26, 2022, assault was the subject of separate litigation and Defendants in that case were granted summary judgment regarding Washington's claim that they failed to protect him from harm. *See Washington v. MD DPSCS agent, et al*., Civil Action No. SAG-22-2424 (D. Md.). Here, Washington asserts that Defendants Wolfe and Murray encouraged and approved of the inmates fighting. ECF 16 at 9. However, contrary to Washington's, allegations, Murray was not present in the institution that day.  ECF 31-14, ¶ 4. When the altercation began, Wolfe was outside the open tier door ready to intervene but in a position of safety in the event inmates sought to attack staff. ECF 31-10, ¶ 4.  Because Wolfe was so stationed, he was able to intervene and stop the fight quickly, within 18 seconds of its start. *Id.*, ¶¶ 3-5.

The video of the incident confirms Wolfe's declaration: it shows two inmates enter Washington's cell and, within eight seconds, Wolfe enters the tier with the radio by his face,

ascends the stairs, directs the inmates to stop, and the inmates immediately comply and leave Washington's cell.  ECF 31-13 (Video D, filed separately); ECF 31- 10, ¶¶ 3, 4. Wolfe avers that as soon as the inmates entered Washington's cell, he called a 10-10 code for back up. ECF 31-10, ¶ 3. At the time of the August 26, 2022, incident he and other officers were properly positioned: outside of the open tier door, ready to intervene if required, but at a safe distance if inmates moved to attack them. ECF 31-10, ¶ 4.  Wolfe further explains that it would not have been safe for the correctional officers or for the inmates to be inside the tier because inmates could injure officers and then attack each other. *Id*.

Wolfe specifically denies that he then, or at any other time, gave a thumbs up to any inmate for an assault. ECF 31-10 ¶ 5. He denies encouraging the incident or seeing any other officer encourage the inmates to fight or approve of the fight. *Id.* Wolfe explains that all officers present "did their best to end the fight quickly."  *Id*.  The video of the incident does not have sound, but there is no apparent indication from the video that any officer approved or encouraged the fight. ECF 31-13 (Video D, filed separately).

ii.    November 12, 2022, incident

Washington claims that after filing Civil Action No. SAG-22-2424, on November 12, 2022, his cell door was opened so that he could go into a mop closet to fight other inmates.  ECF 16 at 3-4.  Washington's medical records for November 2022 do not show any visits, sick calls, or reports of any injury related to an incident consistent with a fight.  ECF 31-9 at 2-11.  He was seen on November 12, 2022, by medical staff but did not mention any altercation. *Id*. at 2-5.

Adkins specifically denies ever hearing that Washington was involved in a fight in a closet or that Washington voiced any concerns about such an incident. ECF 31-8, ¶ 5. Wolfe, Murray, Judy, Rounds, Dye, Vinci, Pattison, Ritchie, Metz, Raley, and Johnson each specifically deny

hearing any information before the filing of this complaint that Washington was involved in a fight in a closet or had any advance concern about such an incident. ECF 31-10, ¶ 8; ECF 31-14, ¶ 8; ECF 31-20, ¶ 9; ECF 31-21, ¶ 8; ECF 31-22, ¶ 7; ECF 31-23, ¶ 6; ECF 31-24, ¶ 8; ECF 31-25, ¶ 6; ECF 31-26, ¶ 8; ECF 31-27, ¶ 8; ECF 31-4, ¶ 9.  Johnson, Wolfe, Murray, Judy, Rounds, Dye, Vinci, Pattison, Ritchie, Metz, and Raley are each unaware of any such incident.  *Id*.

  iii. March 24, 2024, altercation

  Vinci explains that on March 24, 2024, he was working in the control center and saw, on the camera feed, Washington come out of his cell and attack another inmate. ECF 31-23, ¶ 4. Vinci immediately called a 10-10 code for assistance. *Id*.  Officers responded immediately and stopped the fight within 20 seconds. *Id*.  The video of the March 24, 2024, incident shows Washington run out of his cell using a feed-up tray to assault another inmate who was walking by his cell.  ECF 31-7, ¶ 6; ECF 31-6 at 5; ECF 31-8, ¶ 6. ECF 31- 13 (Video C, filed Separately).

  Officer Wariner was sitting in the lobby area just outside the tier entrance at the time of the assault and was able to stop the fight within 20 seconds.  ECF 31-7, ¶¶ 5, 6; ECF 31-13 (Video C, filed separately).  Wolfe and Adkins arrived on the scene after the other officers had secured the area.  ECF 31-10, ¶ 6.  Adkins escorted one of the other inmates involved in the altercation, but it was not Washington. ECF 31-8, ¶ 6.

  As a result of the altercation, Washington was served with a Notice of Inmate Rule Violation.  ECF 31-6 at 5-7.  He pleaded guilty to assault or battery on an inmate and agreed to a sentence of 30 days' disciplinary segregation and the loss of 60 days' credits. *Id.* at 7.  He was assigned to disciplinary segregation where he remained until the completion of his sentence.  ECF 31-5, ¶ 12.  He was then released, in April of 2024, back to Max II general population.  *Id*.

  iv. May 2024 incident

Washington contends that feces and other biohazardous waste seeped through vents into his cell while he was confined to segregation confinement. ECF 16 at 10. Washington filed ARP NBCI-0752-24 on May 21, 2024, stating he was forced to sit in human excrement which entered his cell from vents. ECF 31-13 at 5. He also filed ARP NBCI-0773-24 asserting that Officer Ritchie ignored his complaints about waste exposure and someone changed his cell location to be away from the inmates he believed were the source of the waste, in his view rewarding inmates who had put the waste into his cell. *Id*. at 6-7. The ARPs were investigated but no record of flooding or seeping sewage from one cell to another or request for cleanup/maintenance was found. ECF 31-13 at 5-6; ECF 31-26, ¶ 6. Metz's investigation of the ARPs included review of the daily event logs for reports of any leak or flooding as well as infractions to see if any inmate had been issued an infraction for causing feces or other biowaste to contact Washington or his cell. ECF 31-26, ¶ 6. No evidence of any such event was found and as such Metz recommended the ARPs be dismissed. *Id*.

Adkins, Wolfe, Murray, Judy, Rounds, Dye, Vinci, Pattison, Ritchie, Raley, and Johnson each specifically deny ever hearing that Washington was attacked with urine and feces or had any other concerns about such an event. ECF 31-8, ¶ 4; ECF 31-10, ¶ 7; ECF 31-14, ¶ 7; ECF 31-20, ¶ 8; ECF 31-21, ¶ 7; ECF 31-22, ¶ 6; ECF 31-23, ¶ 7; ECF 31-24, ¶ 7; ECF 31-25, ¶ 5; ECF 31-27, ¶ 7; ECF 31-4, ¶ 8. They each deny being aware of any such incident. *Id*. Ritchie specifically states that had Washington reported the incident to him, he would have looked into the matter and written an infraction against the offending inmate or possibly recommended changing Washington's cell location. ECF 31-25, ¶ 5.

v.    August 17, 2024, incident

As to the August 17, 2024, incident, at the start of the altercation, corrections staff were positioned outside of the tier door looking into the tier. ECF 31-11, ¶ 2; ECF 31-12, ¶¶ 2, 3, 8; ECF 31-13 (Video B, filed separately). Neither Adkins nor Wolfe were working on August 17, 2024. ECF 31-8, ¶ 7; ECF 31-10, ¶ 9. Within the first seconds of the attack, Miller stood to respond to the altercation and called for backup: the fight was ended within 11 seconds. ECF 31-11, ¶¶ 5-8; ECF 31-12, ¶¶ 5-8; ECF 31-13 (Videos A and B, filed separately).

The Court has independently reviewed the video which shows an inmate run out from near a cell door into the tier hall where Washington was walking. ECF 31-13 (Video A, filed separately); *see also* ECF 31-11, ¶¶ 5, 6; ECF 31-12, ¶ 7. Washington was approaching a trash can while Miller was seated at the desk behind the glass at the end of the tier, watching activity on the tier. ECF 31-13 (Video B, filed separately); ECF 31-12, ¶ 8; ECF 31-11, ¶ 7. Miller stands up when seeing the other inmate hit Washington and radios for back up: as back up arrives, Miller enters the tier. *Id*. The fight is ended within seconds. *Id*.

Kelley heard the call for assistance and responded to the tier. ECF 31-11, ¶ 7. As Kelley arrived at the scene, she saw Miller and although in her view they did not yet have sufficient support to safely do so, they entered the tier to confine the fight and limit the inmates' access to the rest of the housing unit. ECF 31-11, ¶ 7. They directed the inmates to stop fighting and the fight was ended quickly. ECF 31-11, ¶ 7; ECF 31-12, ¶ 8.

Kelley and Miller each deny that they hesitated in any way in responding to the fight. ECF 31-11, ¶ 8; ECF 31-12, ¶ 9. Raley also responded to the call for back up. ECF 31-27, ¶ 5. When he arrived on the scene, the altercation had resolved and Washington was on the floor. *Id*. Another officer handcuffed Washington and Raley helped escort Washington to a strip cage. *Id*. Raley did not conduct the search of Washington: he conducted a search of another inmate involved in the

altercation. *Id.* Vinci has been on accident leave since May of 2024, and was not working on August 17, 2024. ECF 31-23, ¶ 5.

### 4. Retaliation

In general, Adkins, Wolfe, Kelley, Miller, Murray, Walker, Arnold, Cornachia, Judy, Rounds, Dye, Vinci, Pattison, Ritchie, Metz, and Johnson each deny having ill will toward Washington and each state that they did not take any adverse action against Washington for retaliatory reasons or any reason that was not for the legitimate penological goals of safety and security. ECF 31-8, ¶ 13; ECF 31-10, ¶ 11; ECF 31-11, ¶ 9; ECF 31-12, ¶ 10; ECF No. 31-14, ¶ 9; ECF 31-15, ¶ 8; ECF 31-16, ¶ 10; ECF 31-17, ¶ 8; ECF 31-20, ¶ 11; ECF 31-21, ¶ 9; ECF 31-22, ¶ 8; ECF 31-23, ¶ 8; ECF 31-24, ¶ 9; ECF 31-25, ¶ 7; ECF 31-26, ¶ 9; ECF 31-4, ¶ 12. None are aware of any correctional staff who have ill will toward Washington or took retaliatory actions against Washington. *Id.* Judy further states that he is not aware of any wrongdoing by either Adkins or Kelley in regard to Washington. ECF 31-10, ¶ 10. Rounds specifically denies taunting Washington about his housing in Max II general population or about other inmates. ECF 31-21, ¶ 10.

Additionally, Metz explains that he has never been the Housing Unit 2 manager. ECF 31-26, ¶ 3. Metz has supervised Rounds, Wagner, and Pattison, and when Kelley works overtime in Housing Unit 2 he has sometimes supervised her. *Id.*, ¶ 4. Metz has never supervised Adkins or Dye. *Id.* He is not aware of any occasion when any of these officers committed improper acts regarding Washington. *Id.*

### a. Property

Adkins explains that on June 8, 2023, he confiscated a TV from another inmate who claimed Washington loaned it to him. ECF 31-8, ¶ 9. DPSCS policy provides that when a prisoner

claims another prisoner loaned property to them the item is confiscated. *Id*. The policy is designed to deter inmates from stealing or coercing the transfer of property from one inmate to another. *Id*. Later it was confirmed that Washington was the owner of the TV and it was returned to him. *Id*. Adkins specifically denies confiscating a tablet or X-box from Washington. *Id*., ¶ 11. Adkins states he understood that Washington did not have a tablet or X-box at NBCI. *Id.* He also denies telling Washington that if he withdrew his ARPs, he would arrange to return any property not in his possession. *Id*., ¶12.

The confiscation form completed by Adkins on June 8, 2023, shows that a TV was confiscated from inmate Green and the DOC number was "scratched out". ECF 31-13 at 16.   The form reflects that the TV was to be held until ownership was proven. *Id*. Ultimately, it was determined that Washington was the owner and the TV was returned to him. *Id*. Washington's Personal Property Inventory Form completed on March 24, 2024, when he was transferred to segregation confinement, does not show that he possessed a tablet, TV, or X-box.   ECF 31-13 at 15; ECF 31-21 at 4.

Rounds explains that he completed Washington's Personal Property Form. ECF 31-21, ¶ 4. He explains that it has been common for General Population units to handwrite "Tablet" on the inventory under the appliance category account for an inmate having a state-issued tablet among his property. *Id*.  Washington's form did not have a check or a handwritten number next to the word Tablet: Washington did not have a tablet at the time the inventory was completed or when he received his property back. *Id*.  He also did not have a TV or X-box. *Id*.

Tablets are state property that are loaned to inmates: they do not become the property of the inmate.  ECF 31-13, ¶ 4. Further, if Washington loaned his TV or other property to another

inmate in order to avoid having it confiscated by staff then it would not appear on either the confiscation form or on Washington's property inventory.  *Id.*, ¶ 5.

Dye specifically denies giving Washington's commissary items to another inmate. ECF 31-22, ¶ 4. And Rounds did not deny a mattress or blanket to Washington. ECF 31-21, ¶ 3.

b.  Cells

Cornachia explains that cells in HU2A each have 1 cable receptable and 1 receptacle with 2 electrical outlets.  ECF 31-17, ¶  6. Arnold, Walker, and Cornachia each state that they do not have any control over how many outlets are in a cell.  ECF 31-16, ¶ 7; ECF 31-15, ¶ 6; ECF 31-17, ¶ 6.

**c.**  Verbal threats

Adkins, Kelley, Miller, and Dye each deny telling anyone that Washington was a snitch. ECF 31-8, ¶ 10; ECF 31-11, ¶ 10; ECF 31-12, ¶ 12; ECF 31-22, ¶ 4.  Adkins recalls that when he was returning another inmate to his cell, Washington asked the inmate about his TV and the inmate responded by calling Washington a snitch and telling him to shut up. ECF 31-8, ¶  10. Adkins states that was the only occasion he heard anyone call Washington a snitch. *Id.*  Kelley and Miller state that correctional staff avoid using the term snitch because it is inflammatory and would increase the danger not only to prisoners but also to staff who respond to prisoner fights. ECF 31-11, ¶ 10; ECF 31-12, ¶ 12. Additionally, Kelley and Miller offer that they have never heard any correctional officer refer to Washington as a snitch. ECF 31-11, ¶ 10; ECF 31-12, ¶ 12.  Dye denies telling any inmate information about Washington, including that he was from Minnesota.  ECF 31-22, ¶ 4. Pattison also denies telling other inmates any information about Washington. ECF 31-24, ¶ 5.

d.  Interference with ARPS

Miller states he has never interfered with processing any ARPs filed by Washington, nor is he aware of other officers doing so. ECF 31-12, ¶ 12. Murray, Judy, Rounds, Dye, Vinci, Pattison, Ritchie, Metz, and Raley each state that they do not have a sense of Washington's history of filing ARPs. ECF 31-14, ¶ 3; ECF 31-20, ¶ 3; ECF 31-21, ¶ 2; ECF 31-22, ¶ 3l; ECF 31-23, ¶ 3; ECF 31-24, ¶ 3; ECF 31-25, ¶ 3; ECF 31-26, ¶ 5; ECF 31-27, ¶ 3. Additionally, Rounds and Dye explain that they do not collect or process ARPs. ECF 31-21, ¶ 2; ECF 31-22, ¶ 3. Dye denies being aware of anyone interfering with Washington's ARPs. ECF 31-22, ¶ 3. Arnold explains that he never ignored or refused to allow anyone to process an ARP filed by Washington. ECF 31-16, ¶ 9. Vinci and Metz each aver that they never ignored, destroyed, or interfered with the processing of Washington's ARPs. ECF 31-23, ¶ 3; ECF 31-25, ¶ 5.

Pattison denies ever having a conversation with Washington. ECF 31-24, ¶ 3. He further denies that he was aware that Washington spoke to Intel about him. *Id.*, ¶ 4. Pattison specifically denies collecting inmate request slips from Washington and if he had, he did not and could not give those to other inmates. *Id.*, ¶ 5

e.  False Report

On August 15, 2024, Raley issued Washington a Notice of Inmate Rule Infraction for refusing housing. ECF 31-6 at 8. Raley advised Washington that he was moving "into a 2A9A with another [inmate]." Washington responded that he was not taking a cellmate and Raley advised that if he did not, he would be returned to segregation and receive an adjustment but Washington responded that he would not go into the cell with another inmate. *Id.* Raley denies filing any false report regarding Washington. ECF 31-28, ¶ 4. He reaffirms his statements made in the August 15, 2024 Notice of Inmate Rule Infraction and asserts that the report was written in good faith and based on his observations. *Id.*

5. *Exhaustion of Administrative Process*

Washington instituted this case on April 17, 2024. ECF 1. Between arriving at NBCI and September 9, 2024, when he filed his Amended Complaint (ECF 16), he filed 62 administrative remedy procedures, ten of which he withdrew. ECF 31-13 at 8-12. Prior to filing his Amended Complaint, Washington filed four appeals to the Commissioner of Corrections. ECF 31-18, ¶ 3 and at 3-26.

On September 28, 2023, the Commissioner of Corrections received an appeal for ARP NBCI-0673-23 wherein Washington complained that Kelley did not provide him a second ARP, and complained in general about dangers at NBCI: the appeal was dismissed as untimely. ECF 31-18 at 3-6.

Washington also appealed ARP NBCI-0717-23, complaining about the headquarters Administrative Remedy Coordinator rather than the contents of the underlying ARP which asserted Kelley taunted him and refused to give him an ARP form: the appeal was dismissed for failure to comply with institutional instructions to provide additional information. ECF 31-18 at 7-10.

In a letter received by the Commissioner on January 27, 2023, Washington generally complained about being housed on Max II general population. ECF 31-18 at 12-14. The Commissioner responded that same day advising the letter was not accepted for processing because the intent of his letter was not discernible. *Id.* at 11. He was instructed to follow proper procedure and submit additional information, but he did not do so. *Id.*

On November 6, 2024, Washington filed documents in which he stated that the documents were not an appeal "but a direct request" for transfer or to remain on segregation. ECF 31-18 at

17-18.  In response to the letter, the Commissioner instructed Washington to provide additional information, including the underlying ARPs, but he failed to do so.  ECF 31-18 at 16.

Washington filed four items with the Inmate Grievance Office ("IGO"). ECF 31-19, ¶ 2. Grievance 20220703 was an appeal of ARP 845-22 alleging his mail was improperly withheld. ECF 31-19, ¶ 3, and at 4-9.  Grievance 20240082 concerned loss of property. ECF 31-19 at 10-13. Specifically, Washington alleged that Dye and other officers gave unspecified property to other prisoners and Dye told other inmates that Washington was "running" from Minnesota and would not give him a single cell. *Id.*  Washington also complained about double bunking. ECF 31-19 at 13. In grievance 20240083, Washington stated that on November 22, 2022, his cell door was opened so he could fight another prisoner in a closet.  ECF 31-19 at 17-18.  Grievance 20240084 asserted that on January 12, 2024, he put ARPs in his door but Miller and Vinci delayed picking up the ARPs and would not give him a signed copy. He stated he believed the ARPs were destroyed. ECF 31-19 at 22-23. Within that grievance Washington also asserted that unnamed correctional staff failed to provide him a tablet from when he was at incarcerated at JCI in February of 2022. *Id.* at 23.

In response to each of the four IGO grievances, Washington was directed to submit backup paperwork to demonstrate he filed an ARP and an appeal of the ARP. He was advised that his case would be dismissed if he failed to follow instructions and provide the requested documentation. ECF 31-19 at 4-5, 10-11, 15-16, 20-21.  Each grievance was dismissed because Washington failed to follow the instructions to provide additional information. ECF 31-19, ¶ 4.

## II.    LEGAL STANDARDS

As permitted by Rule 12(d), Correctional Defendants sought dismissal pursuant to Rule 12(b)(6) or, in the alternative, summary judgment pursuant to Rule 56 and submitted declarations

and other documents with their motion. ECF 30, ECF 31-1, ECF 31-3 to 31-27, ECF 45-2. Summary judgment typically is not granted "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2011). However, "where matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment" under Rule 12(d) as long as all parties "have a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Here, after receipt of Correctional Defendants' motion, the Clerk of this Court mailed a "Rule 12/56 letter" to Washington, alerting him to potential consequences of a failure to respond to the Correctional Defendants' motion. ECF 34. Washington submitted filings captioned as or referencing his opposition "Defendants' Motion to Dismiss, or in the Alternative, Summary Judgment," *see* ECF 35, 42. Washington also attached exhibits to his filings. ECF 42-1 and 42-2.

However, in his response in opposition, Washington asks the Court to "deny the defendants motion, appoint counsel for plaintiff, and set a timeline for discovery." ECF 42 at 10. And in his surreply, Washington filed an affidavit in support of his request for discovery. ECF 46-1. Washington states that he is unable to present facts essential to his opposition without the assistance of an attorney or the ability to investigate and interview Defendants. *Id*. at 1. Washington states that he needs to interview witnesses including inmates and other NBCI staff who he spoke with regarding his ongoing issues and concerns. *Id*. at 2. He claims that these witnesses will verify and validate his complaints. *Id*. The Fourth Circuit has emphasized that discovery is "broadly favored" in advance of reaching summary judgment and district courts are to afford pro se plaintiffs leniency in regard to the requirements of Rule 56(d). *Farabee v. Gardella*, 131 F.4th 185, 193-95 (4th Cir. 2025).

Because he is proceeding pro se, Washington has not had an opportunity to properly evaluate the credibility or completeness of the defendants' statement of facts. In particular, in order to establish deliberate indifference and retaliation, Washington needs discovery to explore the mindset and knowledge of the defendants and the extent of any defendant's knowledge of threats to Washington's safety, including the basis for his belief that he could not be safely housed in general population. Washington seeks to depose inmates and other correctional staff regarding conversations he had with them regarding his concerns.

Correctional Defendants allegedly had a role in the review of Washington's concerns regarding his safety and the decisions to return him to general population. They also were responsible for investigating his formal and informal complaints. It is not clear what, if any, additional actions any of the named Correctional Defendants should have taken in reviewing Washington's repeated expressions of concern for his safety. Further, while the Court has been furnished with some information concerning the process for returning Washington to general population, it has not been provided specific information concerning Washington's case management reviews, such as how and why the intelligence unit deemed it safe to return Washington to general population or whether Washington was interviewed by anyone in the intelligence unit regarding his concerns. It is also not clear what, if any, responsibility Defendants had to gather additional information regarding Washington's concerns for his safety and allegations of retaliation by staff before determining that additional actions should be taken. It is also not apparent from the record before the Court what each Defendant knew, if anything, regarding Washington's administrative grievance history, informal complaints about them, or prior federal lawsuit. Therefore, it is not possible for the court to determine the role of each Defendant and their subjective knowledge in regard to the over-arching retaliation claims

asserted by Washington. In short, Washington is entitled to explore these topics through discovery.

Finally, to the extent that other individuals, including members of the intelligence division, may be responsible for Washington's return to general population, discovery will allow Washington the ability to determine the identity of these individuals and to request to file another amended complaint, if warranted. Washington has reasonably articulated the reasons he needs discovery and that discovery will assist him in disputing Defendants' contentions. In light of the foregoing, Correctional Defendants' dispositive motion shall be denied without prejudice and counsel appointed to assist Washington.

III.    **CONCLUSION**

For the reasons set forth above, Correctional Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, is DENIED without prejudice. A separate Order follows detailing each of the rulings made herein.

Dated: September 15, 2025

/s/
_____
Stephanie A. Gallagher
United States District Judge